**UNITED VIRGINIA FACTORS CORPORATION, Appellee,**

**v.**

**The AETNA CASUALTY AND SURETY COMPANY, Appellant.**

**No. 79–1132.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1980.

Decided June 19, 1980.

James L. Sanderlin, Richmond, Va. (Henry V. McVey, III, Thomas M. Wolf,

---

McGuire, Woods & Battle, Richmond, Va., on brief), for appellant.

Robert P. Buford, Richmond, Va. (E. Milton Farley, III, Lathan M. Ewers, Jr., Joseph C. Kearfott, Hunton & Williams, Richmond, Va., on brief), for appellee.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and SPROUSE, Circuit Judge.

FIELD, Senior Circuit Judge:

The question presented by this appeal is whether a loss suffered by United Virginia Factors Corporation (Factors) is covered by the blanket bond issued by The Aetna Casualty and Surety Company (Aetna). The district court found the loss to be compensable and entered summary judgment against Aetna in the amount of $550,000 which was the stipulated amount of the loss. Aetna has appealed.

Factors is engaged in the business of factoring which includes the purchase of accounts receivable. Under established factoring practices, a company selling and assigning accounts to Factors is referred to as the client and the debtors on the accounts are referred to as the client's customers. Time-Out Fashions, Inc., and Rumpeldresskins Fashions, Inc., (jointly referred to as Clients) were engaged in the manufacture and sale of women's apparel. Factors entered into a factoring agreement with Clients under which the latter sold and assigned to Factors certain "accounts, contract rights, documents, instruments, and other evidence of customer indebtedness." Factors agreed to pay to Clients the face amount of the accounts on their maturity date less a charge of 1¼%. As a matter of practice, Factors, acting pursuant to the agreement, paid Clients an advance of up to 85% of the face amount of the accounts less the initial 1¼% charge. Under this arrangement, the remaining face amount of the accounts was to be paid on the maturity dates, and interest on the advance was to be deducted from this latter payment.

Factors purchased these accounts without recourse, and if the customers failed to pay an account Factors was required to bear the loss. Clients did, however, warrant to Factors that each account was a bona fide existing obligation, and if an account assigned to Factors was not paid because the account was not bona fide, Clients were obligated under the agreement to repay the amounts advanced, with interest. Clients agreed to provide Factors with a schedule of the receivables purchased by it, together with copies of customers' invoices carrying the statement on their face that the accounts receivable represented by such invoices had been assigned and were payable only to Factors. In 1976, Clients sold and assigned to Factors certain accounts receivable which were wholly fictitious. The customers named on these accounts had not purchased the goods and thus had no obligation to pay Factors. Factors entered into the transactions believing that the accounts were valid receivables, and prior to discovering the fraud paid Clients an amount in excess of $832,000. The officers of Clients were later convicted of mail fraud and Factors recovered a portion of the advance payments by the sale of collateral.

Factors' claim was made under Insuring Agreement (B) of the bond issued by Aetna which provides:

The Underwriter * * * agrees with the Insured * * * to indemnify and hold harmless the Insured for:

(B) Loss of Property * * * through * * * false pretenses * * *.

Aetna denied coverage, contending that the claim is barred from coverage by Exclusions 2(e)(1) and (2) which provide in part as follows:

Section 2. THIS BOND DOES NOT COVER

* * * * * *

(e) loss resulting from the complete or partial non-payment of, or default upon

(1) any loan or transaction in the nature of, or amounting to a loan made by or obtained from the Insured, or

(2) any note, account, agreement or other evidence of debt assigned or sold to, or discounted or otherwise acquired

by, the Insured whether procured in good faith or through trick, artifice, fraud or false

pretenses unless such loss is covered under Insuring Agreement (A), (D) or (E)

* * *.

In granting Factors' motion for summary judgment, the district court concluded that the transaction was not a loan, and for that reason the loss was not excluded from coverage by section 2(e)(1). In rejecting the "loan" exclusion the district judge observed that it was appropriate to call the transaction a sale but held that exclusion 2(e)(2) did not apply, stating " * * * it would appear at first glance that 2(e)(2) would exclude coverage and yet I am persuaded that 2(e)(2) does not refer to this situation because, indeed, there was no account sold." Aetna challenges both of these conclusions of the district court.

■ We agree with Factors and the district court that these transactions did not qualify as loans subject to exclusion from coverage under section 2(e)(1). The flaw in Aetna's position on this point is that it would convert any fraudulent transaction into a loan, and the courts have consistently rejected such an argument. In *First National Bank of Decatur v. Insurance Co. No. Am.*, 424 F.2d 312, 316 (7 Cir. 1970), the court observed:

Mildly stated, it does not comport with the usual understanding to say that every time one person wrongfully obtains property from another and thus becomes legally obligated to restore it, he has succeeded in obtaining a loan from his victim.

Nor does the fact that the agreement gave Factors an express right to recover from Clients the amounts paid on the spurious invoices change the nature of these transactions. While it is true that the invoices assigned to Factors carried a warranty from the Clients that they represented bona fide existing obligations, the right of Factors to recover for a breach of such warranty was merely a contingent contractual right incident to the purchase and could not convert the transaction into a loan.

The distinction between a purchase and a loan was aptly drawn by the Second Circuit

in *In re Grand Union Co.*, 219 F. 353, 356 (1914):

A sale is the transfer of property in a thing for a price in money. The transfer of the property in a thing sold from a buyer to a seller for a price is the essence of the transaction. And the transfer is a transfer of the general or absolute property as distinguished from a special property.

A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows.

In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form. 39 Cyc. 926.

In our opinion the transactions in question lacked the essential elements of a loan as that term is ordinarily understood, and do not fall within the exclusion of section 2(e)(1).

Whether these transactions were excluded from coverage under section 2(e)(2) presents a more troublesome question. Aetna takes the position that since the loss resulted from the non-payment of the accounts which were sold and assigned to Factors, the plain reading of section 2(e)(2) excludes it from coverage. The district court, however, was of the opinion that the exclusion did not apply to this situation because the accounts which were sold to Factors were not valid obligations. The district judge further observed that there was no "faulty credit judgment" on the part of Factors, but that the loss was caused by the acceptance of fictitious invoices representing non-existent debts, and that as such the loss was not excluded from coverage. The court characterized the conduct of Clients as "covert theft" and concluded that it was a properly insurable risk. In support of the conclusion of the district

court Factors argues that the purpose of exclusions 2(e)(1) and (2) is to prevent insurance coverage for credit losses, and that in the present case the cause of the loss was the Clients' dishonesty and was not the result of poor credit analysis or bad judgment on the part of Factors.

There is a remarkable absence of decisional law involving claims based upon the sale of fictitious receivables, but there have been a number of cases addressed to claims under blanket bonds where such fictitious accounts have been pledged as collateral for loans. One of these cases, *Maryland Casualty Co. v. State Bank & Trust Co.*, 425 F.2d 979 (5 Cir. 1970), is relied upon by both Aetna and Factors. That case involved the loan exclusion clause of the blanket bond of a bank which had made a loan secured by the pledge of warehouse receipts for cotton which, in fact, had been sold to others before the loan was made. In its suit against the bonding company the bank argued that the transaction was a theft and not a loan. The Fifth Circuit, noting that it was uncontradicted that the basic transaction was a loan and that the default thereon was the immediate cause of the loss, held that "[t]he transaction thus fell squarely within the terms of the loan exclusion clause," *Id.*, at 982, and that the exclusion could not be nullified by the subjective fraudulent intent of the borrower or his use of spurious collateral.

Factors contends that *Maryland Casualty* supports its position, pointing out that there was no infirmity in the loan or the note evidencing the debt in that case, whereas in the present case, Factors paid money for receivables which were, in fact, non-existent. In making this argument Factors again emphasizes that since the purported invoices represented no indebtedness, there was no "credit loss within the purview of the loan exclusion clause." To accept this argument of Factors, however, would require that we ignore the plain language of the bond that a loss which results from the non-payment of either a loan or an account or other evidence of a debt is excluded from coverage "whether procured in good faith or through trick, artifice, fraud or false

pretenses unless such loss is covered under Insuring Agreement (A), (D) or (E) * * *." If the exclusion of section 2(e)(2) were not intended to apply to spurious documents such as the subject invoices there would be no reason for exempting from the exclusion a loss covered under Insuring Agreement (E) which covers "securities, documents, or other written instruments" which have been "counterfeited or forged as to the signature."

In a number of cases involving the pledge of fictitious invoices as collateral for loans, the insureds have attempted to escape the impact of the loan exclusion clause by contending that the fictitious invoices were "counterfeited" within the meaning of Insuring Clause (E). The majority of the courts, however, have rejected this contention, and in doing so have given us some guidance in the case at hand. *See, e. g., Maryland Casualty Co. v. State Bank & Trust Co., supra*, 425 F.2d 979; *American National Bank & Trust Co. v. Fidelity & Cas. Co.*, 431 F.2d 920 (5 Cir. 1970); *Capitol Bank of Chicago v. Fidelity and Casualty Co. of N.Y.*, 414 F.2d 986 (7 Cir. 1969); *Exchange Nat. Bank of Olean v. Insurance Co. of No. Amer.*, 341 F.2d 673 (2 Cir. 1965), *cert. denied*, 382 U.S. 816; *First National Bank of South Carolina v. Glens Falls Ins. Co.*, 304 F.2d 866 (4 Cir. 1962).

In rejecting a claim under coverage (E), the Second Circuit in *Exchange Nat. Bank of Olean v. Insurance Co. of No. Amer., supra*, observed:

Not all defaulting loans obtained upon the basis of fraud and deception are covered. In fact, the bond generally excludes from coverage losses resulting from default on loans, regardless of whether the loan was procured through trick, artifice, fraud or false pretenses; the limitation on this exclusion for loans fraudulently obtained through the use of counterfeit documents merely appears as an exception to the general exclusion. There is a difference between extending credit on the basis of pledged counterfeit stock certificates, a risk clearly within the purview of the bond, and extending credit on the basis of invoices that cover

non-existent shipments and that have been submitted as evidence of previously pledged accounts receivable. The bank could verify the existence of the pledged accounts receivable by inquiring with the loan applicant's purported customer, while detecting a counterfeit security is likely to pose significantly different and more serious risks to the bank.

341 F.2d, at 676. This statement, of course, was made in the context of a claim under coverage (E) growing out of the non-payment of a loan, but it occurs to us that, similarly, the language of the bond excludes from coverage losses resulting from the non-payment of accounts purchased by the insured regardless of the fact that the purchase was procured through trick, artifice, fraud or false pretenses, and the only exception to this general exclusion is a transaction involving forged or counterfeited documents.

In *First National Bank of South Carolina v. Glens Falls Ins. Co., supra*, the insured bank had made a loan secured by the assignment of accounts receivable which turned out to be spurious. In suing to recover under the blanket bond the bank contended that the invoices were counterfeited within the meaning of coverage (E). Writing for the court, Judge Soper concluded that since the invoices were not counterfeited or forged as to the signature of any party, the loss was not covered under the bond. In the course of his opinion, he stated:

> Finally, there is the significant exclusion clause that losses which result from the non-payment of a loan obtained by fraud or false pretenses are not covered by the bond. *This provision obviously shows that the bond is not intended to cover losses incurred through reliance on false pretenses generally unless the fraud is accomplished by the use of a counterfeited or forged signature.* (Emphasis added).

304 F.2d, at 869–870. This reading of the exclusionary language of the bond, in our opinion, applies not only to spurious invoices pledged as security for loans, but also to such invoices which have been purchased outright by an insured.

Accordingly, we hold that the loss suffered by Factors resulting from the non-payment off the accounts receivable which it purchased from Clients was excluded from coverage under section 2(e)(2) of the bond. The judgment of the district court is reversed and the case remanded with instructions to enter judgment for the defendant.

*REVERSED AND REMANDED WITH INSTRUCTIONS.*