LYONS FEDERAL SAVINGS AND LOAN, f/k/a Lyons Savings & Loan Association, Plaintiff,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.

No. 92–1524–PFK.

United States District Court, D. Kansas.

March 22, 1994.

Deborah T. Carney, Golden, CO, and Phillip L. Turner, of Dan E. Turner Law Offices, Topeka, KS, for plaintiff.

Patrick L. Dunn, of Mitchell, Kristl & Lieber, P.C., Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

This matter comes before the court on defendant St. Paul Fire and Marine Insurance Company's motion for summary judgment. Lyons Federal Savings and Loan (Lyons) brought this action against St. Paul claiming coverage under a financial institution fidelity bond for losses attributable to Lyons' servicing contractor, Mortgage Finance, Inc. Service Corporation (Mortgage Finance). Also pending before this court is Lyons' motion to reopen discovery and to add the issues of waiver and estoppel to the pretrial order. On March 14, 1994, the court heard the parties' oral arguments and then adjourned to review and consider the arguments. The court is now ready to make the following findings of fact and conclusions of law.

### I. Facts

In 1974, Lyons entered into an agreement with Mortgage Finance in which Mortgage Finance agreed to act as a servicing contractor for Lyons. Mortgage Finance, a Colorado corporation, was a mortgage banking operation in Denver and was wholly owned and operated by Lyle Carpenter and Marianne McAleer. Mortgage Finance originated loans and then sold the loans to Lyons and other investors while retaining the servicing rights. The servicing rights included collecting the payments, paying the taxes and the insurance on the properties, maintaining the escrow accounts, and working to collect the delinquencies on the loans. Mortgage Finance received a fee for servicing the loan. Mortgage Finance either sold the entire loan to Lyons or a portion of a loan, referred to as a participation interest. This relationship continued until about 1989.

In March 1985, Lyons bought a loan from Mortgage Finance. The loan went to Joseph Dire, who borrowed the money in order to purchase a four-plex in Ft. Collins, Colorado for rental property. This was a long-term mortgage for the full amount borrowed, $188,000.00. After several payments, Dire defaulted on the loan. Mortgage Finance did not diligently pursue foreclosure once the loan went into default.

Eventually, Lyons became aware of the fact that the Dire loan was in default and also discovered that Dire had died. Mortgage Finance had not filed a claim against the Dire estate within the time allowed by law. There is some dispute as to whether Dire signed the note for the loan as the nominee for C. M. & D. Partnership. The partners of C. M. & D. Partnership were: Carpenter & McAleer Associates, a partnership wholly owned by Lyle Carpenter and Marianne McAleer; Dire's Lock and Key Company, a Colorado corporation; and Joseph Dire, Rose Dire and Donna Dire. Lyons was allowed to foreclose on the property; Lyons sold the property and was left with a deficiency judgment of $128,000.00.

In May 1985, Mortgage Finance approached Lyons about a participation loan in what was to be the Fair Oakes Condominiums, located in the Denver area. This was a construction loan totaling $4,800,000.00, with Lyons' participation interest being $250,000.00 for a term of six months at an interest rate of 13½ percent plus a 1 percent fee. Mortgage Finance already had three major lenders in the Fair Oakes project and held a $400,000.00 interest for itself. Thus, when Lyons accepted the offer to invest in Fair Oakes, Mortgage Finance's interest was reduced to $150,000.00. Mortgage Finance failed to register Lyons' participating interest with the county recorder.

The Fair Oakes loan was due on November 1, 1985, but was never paid. In fact, at the time Lyons made the loan to Fair Oakes, Mortgage Finance knew the construction project was over budget and that foreclosure was imminent. By the time Lyons became aware of the Fair Oakes loan's delinquency, the other lenders had accepted a deed in lieu of foreclosure. Those lenders formed the 7117 W. 12th Street Corporation and loaned additional funds to that corporation to complete the project. Subsequently, the other lenders came under the control of the Resolution Trust Corporation (RTC).

By then Lyons had been awarded a judgment of $250,000.00, plus $263,359.89 in accrued interest, against Mortgage Finance arising out of Mortgage Finance's dealing with Lyons on the Fair Oakes loan. In that

suit Lyons was also awarded $50,680.55 for losses to an escrow account controlled by Mortgage Finance. Although St. Paul originally denied coverage on the escrow account loss, St. Paul eventually paid $40,680.55, 100 percent of the loss after payment of the $10,000.00 deductible. There are no claims involving the escrow account loss in the suit before this court.

When addressing Lyons' claim against Mortgage Finance, the magistrate judge, in his recommendation to the district court, stated in part:

I further find ... that Defendant Mortgage Finance was obligated and agreed, but thereafter failed, to document [Lyons'] participation interest by an appropriate recording on the public land records of Jefferson County, Colorado, and [Lyons] thus lost its $250,000 investment. This occurred in part by reason of the failure to record [Lyons'] participation interest in the public land records despite specific representations by Mortgage Finance officers that they had, in fact, caused the participation interest to be properly documented and recorded. I further find from the well-pleaded allegations and the evidence that [Lyons'] loan participation proceeds were not used for finalizing the construction of the Fair Oakes project, but were allowed by Mortgage Finance officers to be used by the Fair Oakes developer representatives for other and unauthorized purposes.

(Pltf.'s Memo. in Resp., Ex. 40, *Lyons Federal Savings Assn. v. Mortgage Finance, Inc., Service Corp.*, No. 90–M–569, slip op. at 7, ¶ 10 (D.Colo. Dec. 28, 1990).) Lyons then proceeded to garnish Mortgage Finance, which allowed Lyons to step into Mortgage Finance's shoes. This enabled Lyons to recover $285,000.00 from the RTC because the RTC sold the property and wanted to clear the title. In addition, Lyons recovered $192,744.16 of the judgment from other sources. As of May 19, 1993, however, the judgment remained unsatisfied in the amount of $92,000.23 plus interest of $21,502.94.

On June 3, 1987, Carpenter and McAleer filed separate, individual bankruptcies pursuant to Chapter 7 of the United States Bankruptcy Code. On or about August 3, 1987, Carpenter and McAleer Associates filed a voluntary bankruptcy and the court ordered the joint administration of the partnership's bankruptcy estate with the individuals' bankruptcy estates. Lyons had no knowledge of these bankruptcy filings until the summer or fall of 1989.

In 1990, the bankruptcy estates' trustee, Ross J. Wabeke, filed a complaint against Lyons in an attempt to void the assignments of 10 percent participation interests in three loans by Mortgage Finance to Lyons. These three assignments occurred after the bankruptcies were filed; however, Mortgage Finance has never filed bankruptcy. Mortgage Finance made the transfers to provide Lyons with additional collateral on another loan that was in default. The trustee based his claims on the theory that Mortgage Finance was wholly owed by Carpenter and McAleer, and therefore the transfers were fraudulent as to Carpenter and McAleer Associate's creditors. St. Paul refused to defend Lyons in this adversary proceeding. The bankruptcy judge dismissed the trustee's complaint.

On or about May 14, 1987, Lyons purchased a financial institution fidelity bond from St. Paul. The coverage included $250,000.00 worth of coverage for service contractors with a $10,000.00 deductible. The bond's insuring clauses state in pertinent part:

(K) SERVICING CONTRACTORS

(1) Loss resulting directly from dishonest or fraudulent acts committed by any Servicing Contractor acting alone or in collusion with others.

Dishonest or fraudulent acts as used in this Insuring Clause shall mean any dishonest or fraudulent acts committed by such Servicing Contractor with the manifest intent

(a) to cause the Insured to sustain such loss; and

(b) to obtain financial benefit for the Servicing Contractor or for any other person or organization intended by the Servicing Contractor to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards,

**1444**

profit sharing, pensions or other employee benefits earned in the normal course of employment or performance of the servicing contract.

(2) Loss of Money, including obligations of the United States of America, collected or received for the Insured by any such Servicing Contractor through the failure of such Servicing Contractor to pay to the Insured the Money so collected or received as is discovered to be due and payable while this Insuring Clause is in force, except, however, Money disbursed by such Servicing Contractor in accordance with instructions from the Insured.

(Second Amended Complaint, Ex. B at 5.)

The bond's conditions and limitations section provides the following definitions:

(q) Servicing Contractor means a natural person, partnership or corporation, other than an officer or employee of the Insured, duly authorized by the Insured to perform any or all of the following:

(a) collect and record payments on real estate mortgage or home improvement loans made, held or assigned to the Insured, and establish tax and insurance escrow accounts,

(b) manage real property owned by or under the supervision or control of the Insured,

(c) perform other acts directly related to the above,

but only while such natural person, partnership or corporation is actually performing such services within the United States of America, or within the District of Columbia, Puerto Rico, the American Virgin Islands or Canada.

The term Servicing Contractor shall include the partners, officers and employees of such Servicing Contractors and each such Servicing Contractor and its partners, officers and employees shall collectively be deemed to be one person for all purposes of subsection (c) of the Section captioned LIMIT OF LIABILITY/NON–ACCUMU-LATION OF LIABILITY OF THIS BOND.

(Second Amended Complaint, Ex. B at 11.)

The bond's exclusions section provides in part:

Section 2. This bond does not cover:

. . . .

(e) loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the Insured as a lender or as a borrower, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Clauses (A), (D), (E) or (N);

. . . .

(x) under Insuring Clause (K), in addition to all the other Exclusions,

(1) loss resulting from the insolvency, bankruptcy, or taking over by a receiver or other liquidator or by State or Federal Officials of any depository institution, unless such depository is a Servicing Contractor covered under this bond and unless such insolvency, bankruptcy or taking over results from fraud or dishonesty of officers or employees of such depository institution;

(2) under paragraph (2) loss through the failure of any Servicing Contractor covered under this bond to collect or receive Money for the account of the Insured, any agreement between such Servicing Contractor and the Insured to the contrary notwithstanding;

(3) under paragraph (2) loss of Money collected or received for the account of the Insured by any Servicing Contractor covered under this Bond unless such Servicing Contractor is legally liable to the Insured on account of the loss of such Money;

(4) loss resulting directly or indirectly from the complete or partial non-payment of, or default upon any loan or

transaction in the nature of a loan or extension of credit made to a Servicing Contractor, including any such loan or transaction established to provide funds for interim financing or "warehousing" of mortgage loans, whether procured in good faith or through fraud or false pretenses, or loss resulting directly or indirectly from the failure of the Servicing Contractor to pay over Property held as security for any such loan or transaction;

(Second Amended Complaint, Ex. B at 11, 13.)

Lyons' second amended complaint states this court has jurisdiction based upon diversity of citizenship. The complaint then alleges St. Paul: (1) breached the insurance contract by refusing to pay coverage owed Lyons for losses on the Dire loan in the amount of $128,000.00 plus interest and costs; (2) breached the insurance contract by refusing to pay coverage owed Lyons for losses on the Fair Oakes loan in the amount of $51,319.78 plus interest and costs; (3) owes Lyons reasonable attorney fees pursuant to K.S.A. § 40–256 plus interest and costs; and (4) violated the Kansas Fair Claims and Practices Act, K.S.A. § 40–2404, through its bad faith breach of the insurance contract, resulting in damages to Lyons in the form of attorneys' fees, expenses and costs.

## II. *Arguments and Authorities*

■ Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must resolve all disputed facts in favor of the nonmoving party. *White v. General Motors Corp., Inc.,* 908 F.2d 669, 670 (10th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). The moving party must prove beyond a reasonable doubt that it is entitled to summary judgment. *Norton v. Liddel,* 620 F.2d 1375, 1381 (10th Cir.1980).

■ The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The existence of some disputed facts does not automatically preclude granting summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53.

### A. *Coverage on the Dire and Fair Oakes Loans*

■ St. Paul argues the fidelity bond excludes coverage on Lyons' losses on the Dire and Fair Oakes loans. Thus, this court is called upon to interpret the terms of the bond. The Kansas Supreme Court has established rules of construction for the interpretation of insurance contracts. That court has stated:

If a contract is ambiguous and is drafted by one of the parties to the contract, the contract should be strictly construed against the party who drafted it. If, however, the contract is clear and unambiguous, it requires no construction by a court. Thus, the strict construction rule is inapplicable. Failure to abide by the "clear and unambiguous" rule constitutes rewriting the contract, which a court has no authority to do.

*Thomas v. Thomas,* 250 Kan. 235, Syl ¶ 3, 824 P.2d 971 (1992). The court has further explained:

[T]he test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean.

... Where contract provisions and terms are uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail. This principle is based upon the fact that an insurer prepares its own

contract and thereby assumes the duty to make its meaning clear and define limitations in coverage in explicit terms.

*Farm Bureau Mut. Ins. Co. v. Winters,* 248 Kan. 295, 300, 806 P.2d 993 (1991) (citations omitted). As a general rule, "exceptions, limitations, and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." *Catholic Diocese of Dodge City v. Raymer,* 251 Kan. 689, 695, 840 P.2d 456 (1992). In other words, exclusions limit coverage created by insuring clauses, and the insurer has a duty to clearly define those limitations.

St. Paul contends Lyons' losses on the Dire and Fair Oakes loans are due to the nonpayment of those loans, and therefore are excluded from coverage under exclusion 2(c) of the fidelity bond. St. Paul acknowledges insuring clause K provides coverage for any "[l]oss resulting directly from dishonest or fraudulent acts committed by any Servicing Contractor acting alone or in collusion with others." St. Paul maintains insuring clause K is then limited by exclusion 2(c), which states coverage is not extended to any "loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any transaction in the nature of a loan or extension of credit, ... whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses." There are four exceptions to exclusion 2(c); those exceptions concern loss resulting directly from an employee's dishonest or fraudulent acts and loss resulting from transactions involving forged or altered documents. None of the exceptions are applicable here. St. Paul contends the fidelity bond does not provide coverage for credit risks. Therefore, even if Mortgage Finance misrepresented the risk involved in the Dire and Fair Oakes loans, the bond does not cover Lyons' losses.

In response, Lyons argues St. Paul has waived its defenses due in large part to letters written by an attorney representing St. Paul. The court has reviewed the letters filed by both parties and finds nothing in them that leads to the conclusion St. Paul has waived its defenses.

Next, Lyons contends its loan losses are covered by insuring clause K, which covers losses caused by servicing contractors, and clause J, which extends coverage to any loss resulting directly from an agent's dishonest or fraudulent acts. Clearly, insuring clause J is inapplicable. The bond provides the following definition:

(b) Agent means

any person, firm, or corporation duly elected or appointed by the Insured, to do or perform any act or thing which the Insured, in the ordinary conduct of its business might do or perform. The term Agent does *not* include any employee of the Insured, or any person, firm or corporation elected or appointed by the Insured to act in the capacity of:

(1) Servicing Contractor, ...

(Second Amended Complaint, Ex. B at 9 (emphasis added).) There is no question that Mortgage Finance was a servicing contractor. Furthermore, Lyons did not purchase liability coverage for agents. Insuring clause K does extend coverage to losses directly due to Mortgage Finance's dishonest or fraudulent acts as a servicing contractor. The issue, however, is whether the cause of the losses is excepted from coverage by exclusion 2(c).

Lyons maintains exclusion 2(c) is not applicable to the Dire loan because Mortgage Finance had the money to repay the loan and failed to do so. Lyons argues the loss is covered by insuring clause K just as the escrow account loss was covered. Lyons bases this contention on the fact that Carpenter & McAleer Associates controlled the funds of C. M. & D. Partnership; Lyons claims C. M. & D. Partnership was the actual borrower of the Dire loan. According to Lyons, because Carpenter & McAleer Associates and Mortgage Finance were wholly owned by Lyle Carpenter and Marianne. McAleer, it stands to reason that Mortgage Finance had control of any money held by Carpenter & McAleer Associates.

Assuming C. M. & D. Partnership was the true borrower of the Dire loan, Mortgage

Finance and Carpenter & McAleer Associates were two, separate legal entities. The fact that Carpenter & McAleer Associates, or even Lyle Carpenter and Marianne McAleer, may have handled the accounting for C. M. & D. Partnership does not prove Mortgage Finance was paid for the Dire loan and then failed to turn the money over to Lyons. Thus, the question of whether exclusion 2(c) exempts coverage of the Dire loan loss must still be answered.

Lyons argues exclusion 2(c) is ambiguous. According to Lyons, St. Paul's application of the 2(c) exclusion would result in *"any act of a Servicing Contractor ... not [being] covered since their purpose is to collect payments on loans which are loan losses if not paid."* (Pltf.'s Memo. in Resp. at 15.) This is not true, as evidenced by the fact that St. Paul has already paid Lyons for the loss caused by Mortgage Finance on an escrow account.

For support of its ambiguity argument, Lyons cites *United Virginia Factors Corp. v. Aetna Casualty & Sur. Co.,* 624 F.2d 814 (4th Cir.1980). In that case the plaintiff purchased accounts receivable, which were wholly fictitious, from its clients. When the plaintiff was unable to collect on these accounts receivable, it sought coverage under its blanket bond. The insurer denied coverage, contending the claim was barred by an exclusion much like exclusion 2(c) in the suit currently before this court. The district court granted plaintiff's motion for summary judgment, concluding the transaction was not a loan and therefore was not excluded from coverage. The Fourth Circuit agreed with the district court and stated:

> The flaw in [defendant's] position on this point is that it would convert any fraudulent transaction into a loan, and the courts have consistently rejected such an argument. In *First National Bank of Decatur v. Insurance Co. No. Am.,* 424 F.2d 312, 316 (7 Cir.1970), the court observed:
>
> > "Mildly stated, it does not comport with the usual understanding to say that every time one person wrongfully obtains property from another and thus becomes legally obligated to restore it, he has

succeeded in obtaining a loan from his victim."

624 F.2d at 816.

Based on this portion of *United Virginia Factors Corp.,* Lyons contends the bond is ambiguous because it does not define "loan loss" as used in exclusion 2(c). Lyons ignores the fact that *United Virginia Factors Corp.* involved the sale of accounts receivable, and the case currently under consideration involves real loans, not fictitious loans manufactured by Mortgage Finance. Lyons also glosses over the court's ultimate decision in *United Virginia Factors Corp.* There, the court found the plain language of the bond excluded coverage if a loss resulted from the nonpayment of an account, whether procured in good faith or through fraud or false pretense. The court noted that "[i]f the exclusion of section 2(e)(2) were not intended to apply to spurious documents such as the subject invoices there would be no reason for exempting from the exclusion a loss covered under Insuring Agreement (E) which covers 'securities, documents, or other written instruments' which have been 'counterfeited or forged as to the signature.'" 624 F.2d at 817. Ultimately, the Fourth Circuit held plaintiff's loss was excluded from coverage, despite the clients' false representations, because it resulted from the nonpayment of the accounts receivable. 624 F.2d at 818.

Other courts have addressed the issue of whether exclusions nearly identical in wording to exclusion 2(c) were ambiguous. For example, in *Liberty Sav. Bank v. American Casualty Co. of Reading Pa.,* 754 F.Supp. 559 (S.D.Ohio 1990), the plaintiff, a federal savings bank, agreed to purchase residential first mortgage loans from a mortgage company. The mortgage company sold plaintiff 12 loans and represented that the mortgages constituted first and best liens on the borrowers' property. In fact, the homes were encumbered by existing mortgages. When this was discovered, "[p]laintiff paid off the prior mortgages at a cost of $630,659.69 so that it had a first mortgage and note on each of the twelve loans." 754 F.Supp. at 561. Plaintiff then filed a claim under its financial institution bond for the amount expended to

pay off the prior mortgages. The insurer denied the claim and plaintiff filed suit.

The plaintiff claimed its loss was not the result of the nonpayment or default on the loans, but was the direct result of the mortgage company's misrepresentations. The court stated, "The language of the [exclusion] clause is unambiguous. The only issue before the Court is whether the loss sustained by plaintiff fits under the terms of the exclusion clause." 754 F.Supp. at 561. Ultimately, the court held the plaintiff's loss was excluded from coverage and granted the insurer's motion for summary judgment.

In *East Gadsden Bank v. United States Fidelity and Guaranty Co.*, 415 F.2d 357 (5th Cir.1969), a similar exclusion was examined. There the plaintiff, a bank, made loans to a subcontractor who assigned his subcontracts as collateral. The subcontractor, however, failed to bring the checks for the payment of the subcontracts to plaintiff's loan department to pay off his loans. Instead, the subcontractor deposited the contract payments in his regular checking account at the plaintiff bank and then withdrew the money for his own use. Eventually the checking account was depleted and the plaintiff lost a substantial sum of money.

When the insurer failed to pay plaintiff's claim under a financial institution's blanket bond, the plaintiff filed suit, contending the loss was covered under the larceny provision of the bond. The Fifth Circuit found the insurer had not intended "to provide a policy of credit insurance" and that the real cause of the loss was the subcontractor's failure to repay the loans. 415 F.2d at 359. There, the fraud occurred during the repayment of the loan. The court, however, stated the result would be the same if the fraud had occurred in the inducement of the loan.

■ This court has read the fidelity bond and finds it to be clear and unambiguous. Thus, the court need not apply any of the rules of construction. Insuring clause K provides coverage for losses resulting directly from any servicing contractor's dishonest or fraudulent acts. Exclusion 2(c), however, excludes coverage for losses resulting directly or indirectly from the complete or partial nonpayment of a loan. Exclusion 2(c) applies

to losses on transactions involving servicing contractors, even if those transactions were procured "through trick, artifice, fraud or false pretense." Therefore, no matter what misrepresentations Mortgage Finance may have made, Lyons' losses on the Dire and Fair Oakes loans are not covered because the real cause of those losses was the borrowers' failure to pay.

## B. *Duty to Defend*

■ Pursuant to the general agreements section of the bond, St. Paul had a duty to indemnify Lyons for any costs of defending a claim that, "if established against [Lyons], would constitute a collectible loss under this bond." (Second Amended Complaint, Ex. B at 8.) Lyons claims St. Paul breached that duty when it failed to pay Lyons' attorney fees and costs incurred in defending against the bankruptcy estates' trustee's adversary proceeding. The trustee sought to set aside three transfers of 10 percent participation interests made by Mortgage Finance to Lyons. St. Paul argues the trustee's claim, if established against Lyons, would *not* have constituted a collectible loss under the bond, and therefore St. Paul does not have a duty to indemnify.

In order for the trustee's claim to become a collectible loss, it must fall within the coverage provided by insuring clause K. Hence, the loss must result directly from Mortgage Finance's dishonest or fraudulent acts. The bond further defines dishonest and fraudulent acts to be those committed by the servicing contractor (Mortgage Finance) with the manifest intent (1) to cause Lyons to sustain a loss; and (2) to obtain a direct or indirect financial benefit for itself. Even assuming the bankruptcy trustee had prevailed, St. Paul contends there could be no covered loss under the bond because the transactions lack the required manifest intent. Had the trustee won his suit, Lyons would have lost its 10 percent participation interests in those three loans. That, however, would not mean Mortgage Finance intended to create a loss for Lyons by making the transfers. Likewise, at the time of the transfers, Mortgage Finance's transfer of 10 percent of its interest in these

three loans does not manifest an intent to obtain a financial benefit. The facts show the transfers were made in an effort to provide Lyons with additional collateral for another loan. Obviously this does not support a claim that the transfers manifest an intent to cause Lyons to sustain a loss.

Lyons responds by arguing that had the trustee prevailed, Lyons would have experienced a loss, and that there are no exclusions for coverage of this loss. Lyons fails to establish how the losses would have fallen under the coverage of insuring clause K. Applying the clear meaning of the language of insuring clause K, the losses that could have arisen from the bankruptcy trustee's adversary proceeding were not covered losses. Thus, St. Paul did not breach its duty to indemnify Lyons for its costs and attorney fees incurred while defending against the trustee's claim.

## C. Bad Faith Claim

In its second amended complaint, Lyons alleges St. Paul violated the Kansas Fair Claims and Practices Act, K.S.A. § 40-2404, through its bad faith breach of the insurance contract, and that St. Paul owes Lyons reasonable attorney fees pursuant to K.S.A. § 40-256. St. Paul points out that Kansas does not recognize the tort of bad faith claims administration. *State Farm Fire and Casualty Co. v. Liggett*, 236 Kan. 120, 130, 689 P.2d 1187 (1984) ("the tort of bad faith is not recognized in Kansas"); *Spencer v. Aetna Life*, 227 Kan. 914, Syl. ¶ 2, 611 P.2d 149 (1980) ("Legislative provisions authorizing certain penalties against an insurer for lack of good faith are sufficient remedies for an aggrieved insured;" tort of bad faith not recognized). Furthermore, K.S.A. § 40-2404 *et seq.* does not provide a private cause of action for breach of contract, which Lyons admits.

The court need not address the parties' arguments on this issue. Because this court has found St. Paul properly denied coverage on Lyons' claims, there can be no viable claim that St. Paul acted in bad faith.

Accordingly, St. Paul's motion for summary judgment is granted. The court need not address Lyons' motion to reopen discovery and add the issues of waiver and estoppel to the pretrial order.

IT IS THEREFORE ORDERED this 22nd day of March, 1994, that defendant St. Paul Fire and Marine Insurance Company's motion for summary judgment (Dkt. No. 24) is granted.