**In re Michael PELLER and Judith Peller, Debtors.**

**Michael PELLER and Judith Peller, Plaintiffs,**

v.

**SYRACUSE UNIVERSITY, Defendant.**

**Bankruptcy No. 93–24269.
Adv. No. 94–2185.**

United States Bankruptcy Court,
D. New Jersey.

Aug. 9, 1994.

Lawrence R. Pinck, Clifton, NJ, for debtors.

Stuart D. Minion, Law Office of Ronald I. LeVine, Hackensack, NJ, for Syracuse University.

## *OPINION*

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

Before this Court are the following applications brought by the Debtors, Michael and Judith Peller in the instant adversary proceeding:

1) the request for a permanent injunction against the enforcement of a Judgment entered in the matter of Syracuse University v. Neil Peller, et al., Superior Court of New Jersey, Law Division, Bergen County;

2) for a determination that the debt owed by the Debtors to the Defendant, Syracuse University, was discharged in the bankruptcy proceeding.

The Court notes that although the Debtors are essentially requesting a judgment as a matter of law, they do not entitle this as a motion for summary judgment. The Court heard argument on this matter on April 19, 1994 and reserved its decision. The following constitutes the Court's findings of fact and conclusions of law.

### *FACTS*

Michael Peller ("Peller" or "Debtor") and Judith Peller (collectively referred to as "Debtors") are the parents of Neil B. Peller. On April 28, 1991, Neil Peller signed an Intent to Register form for Syracuse University ("Syracuse"). *See* Debtors' Letter Brief filed April 6, 1994 (hereinafter "Letter Brief"), Exh. A (copy of Intent to Register form). Neil Peller's father, Michael Peller, the Debtor, also signed the Intent to Regis-

ter form. The form provided for an "intent to register/advance payment" of $200 and a "housing advance" for $250. The form stated:

> Undergraduates are required to make a nonrefundable advance payment. A housing advance is required from students requesting University housing. These payments will be applied to your first semester charges. Please complete this form and enclose the applicable amount ...
>
> Each of the undersigned understands that University fees and charges are due before confirmation of registration each semester and each of them agrees to pay or make arrangements for payment suitable to the University of all fees and charges during applicant's entire attendance at the University.

*See* Letter Brief, Exh. A.

The form also included a space for the student to check off if his/her parents were no longer responsible for the student's educational expenses. Neil Peller left this space blank.

Subsequent to signing the Intent to Register form, Neil Peller attended Syracuse University for the fall semester of 1991. Syracuse maintains that Neil Peller was enrolled as a full time student from August to December 1991, during which time he lived in student housing, attended classes and received final grades in four classes.

For the fall semester, Neil Peller incurred charges in the amount of $9,965, which included tuition, room, board and various university fees.[1] Payments were made for the fall semester costs in the amount of $1,950, leaving a balance due of $7,615. In addition, Neil Peller incurred spring 1991 semester housing charges in the amount of $386.50. Thus, Syracuse claimed a total of $8001.50 was due as of March 26, 1992. *See* Letter Brief, Exh. B (copy of Syracuse charges).

Syracuse provides that on or about August 21, 1991, Debtor Judith Peller forwarded a personal check to the university in the amount of $6004, which was drawn on her checking account. Syracuse asserts that this

---

1. The amount for tuition was $6,320. The amount for room and board was $2,930.

check was returned twice for insufficient funds.

Moreover, other than the payment of $1,950, neither the Debtors nor Neil Peller made any additional payments to Syracuse. Thus, on September 14, 1992, Syracuse filed a complaint in the Superior Court of New Jersey, Law Division, Bergen County naming Neil Peller, Michael Peller and Judith Peller as Defendants. *See* Letter Brief, Exh. C (copy of complaint)

In the first count of the complaint, Syracuse alleged that Neil Peller became liable to Syracuse for the costs of his education for the fall, 1991 semester based on the signing of the letter of intent. Furthermore, Syracuse claimed that Neil Peller attended the university for the fall, 1991 semester but failed to pay for the educational goods and services provided. Syracuse asserted that Neil Peller incurred certain expenses for the Spring Semester for which he did not pay.

The second count of the complaint alleged that Michael Peller is personally liable for the educational expenses of his son, Neil Peller, since he co-signed the letter of intent. The third count alleges that Judith Peller is personally liable for the educational expenses of her son, without providing a legal basis for this allegation.

In the fourth count of the complaint, Syracuse claimed that Judith Peller personally assumed the debt of her son when she issued a check to Syracuse in the amount of $6004, which was drawn on her checking account. In addition, the complaint alleged that Judith Peller fraudulently represented that she had sufficient moneys in her account to cover the amount of the check when she issued it, since the check was returned for insufficient funds. Syracuse alleged that Judith Peller attempted to fraudulently induce Syracuse into providing services for her son. Syracuse further alleged that had it known the check was "bad," it would have ceased providing the services to Neil Peller.

Neither the Debtors nor their son filed an answer to this complaint and on February 9, 1993, the state court entered a default judgment against them, jointly and severally, in the amount of $8,856.38. Michael Peller asserts that on May 18, 1993, an Order for Wage Execution was entered against him. Furthermore, Judith Peller claims that, on February 3, 1994, a Writ of Execution for Wage Garnishment was entered against her.

On May 20, 1993, the Debtors filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. The Debtors listed unsecured priority debt in the total amount of $1,034,548.61, which included the scheduled amount of $12,950.25 owed to Syracuse. The unsecured claim of Syracuse was listed as a fixed and liquidated debt for "tuition." The Court issued the Debtors' discharge on September 15, 1993.

Subsequent to the discharge, on January 11, 1994, Syracuse obtained an Order for Wage Execution and served it upon the Debtors' respective employers. On March 24, 1994, the Debtors commenced the instant adversary Complaint against Syracuse to determine dischargeability of debt, claiming that the debt owed to Syracuse was dischargeable, and therefore, it was among those debts included in the Debtors' discharge. By that Complaint, the Debtors assert that subsequent to the entry of discharge of the Debtors, Syracuse has pursued collection activities against the Debtors in contravention of the discharge provisions of the Bankruptcy Code.

The Debtors also filed an Order to Show Cause requesting the temporary restraint of the wage execution efforts of Syracuse. On March 25, 1994, the Court entered a temporary stay of Syracuse's execution efforts and permitted the parties to submit briefs on the issue of nondischargeability.

The Debtors argue that the debt owed to Syracuse was not the type designated nondischargeable in 11 U.S.C. § 523(a)(8). The Debtors also assert that they are not responsible for their son's educational costs. Contrarily, Syracuse contends that tuition, housing and other university related charges are loans or educational benefits that are nondischargeable under § 523(a)(8). In addition, Syracuse maintains that a parent, who is a co-signer for the student's educational services is equally responsible for the debt.

## DISCUSSION

### I. Standard for Summary Judgment

▉ Summary Judgment is appropriate only when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party moving for summary judgment has the burden of establishing the nonexistence of any "genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Fairbanks Morse & Co. v. Consolidated Fisheries Co.*, 190 F.2d 817, 824 (3d Cir.1951). Where the nonmoving party bears the ultimate burden of persuasion on a dispositive issue at trial, the nonmoving party must "go beyond the pleadings" and, by way of affidavits, depositions, answers to interrogatories, or admissions on file "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The evidence which the nonmoving party produces to show the existence of a genuine issue must be of sufficient quantum and quality to allow a rational and fair minded fact finder to return a verdict in favor of the nonmovant, bearing in mind the applicable standard of proof that would apply at the trial on the merits. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).[2]

▉ The Court must resolve all factual disputes, all doubts as to the existence of genuine issues of material fact, and any inferences that may be drawn from underlying facts against the moving party. *See Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir.1980); *In re Windsor Communications Group, Inc.*, 68 B.R. 1007, 1010 (E.D.Pa.1986). The purpose of summary judgment is to avoid a trial which is unnecessary and results in delay and expense, by promptly disposing of any actions in which there is no genuine issue of material fact. *Tomalewski v. State Farm*

*Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir.1974). Summary judgment is a "drastic remedy" which is not to be granted liberally. *Id.* (cited with approval in *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981)). Furthermore, some courts have found that "[s]ummary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 185 (8th Cir.1976) (citations omitted), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). Some courts have held that whenever there is even the "slightest doubt" regarding the facts of a case, summary judgment may not be granted. *Tomalewski*, 494 F.2d at 884.

### II. Dischargeability under 11 U.S.C. § 523(a)(8)

Although the underlying policy of the Bankruptcy Code is to permit a debtor a fresh start, Congress chose to exclude certain obligations from the discharge. Certain educational loans are among those debts excepted from discharge. Section 523(a)(8) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless

(A) such loan, benefit, scholarship, or stipend overpayment first became due before more than seven years (exclusive of any applicable suspension of

---

2. The Court of Appeals for the Third Circuit has held that the nonmovant may defend a motion for summary judgment upon a lesser standard of proof, stating "[i]f ... there is any evidence in the record from *any* source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment...." *In re Japanese Elec. Prods. Antitrust Litig.*, 807 F.2d 44 (3d Cir.1985), *cert. denied sub nom. Zenith Radio Corp. v. Matsushita Elect. Indus. Co.*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987) (emphasis added).

the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents ...

11 U.S.C. § 523(A)(8).

Legislative history indicates that "the exclusion of educational loans from the discharge provisions was designed to remedy an abuse by students who, immediately upon graduation, filed [a] petition for bankruptcy and obtained s discharge of their educational loans." *In re Merchant*, 958 F.2d 738, 740 (6th Cir.1992) (citing H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 466–75 *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787); *see also In re Pelkowski*, 990 F.2d 737, 743 (3d Cir.1993) (agreeing with *Merchant* court that Congress intended to prevent abuse in and protect solvency of educational loan programs). Particularly, Congress sought to address "the perceived rise in bankruptcy filings by students on the brink of lucrative careers." *Pelkowski*, 990 F.2d at 742 (citing H.R.Doc. No. 137, 93d Cong., 1st Sess. Pts. I and II (1973), *reprinted in* App. 2 Collier on Bankruptcy § I, at 176–77 15th ed.1992). Moreover, the "availability and solvency of educational loan programs for students, outweighs the debtor's need for a fresh start." *Merchant*, 958 F.2d at 740.

The Debtors, however, argue that the debt, in the instant case, specifically is not derived from a loan but instead, is merely tuition and other related charges from the university. Thus, this Court must determine if the debt owed to Syracuse University for the educational services it provided constitute a loan or educational benefit overpayment. The Court begins with a review of decisions addressing similar issues.

In *In re Hill*, 44 B.R. 645, 646 (Bankr. D.Mass.1984), the court was confronted with a unique circumstance where a University extended credit to a student. In *Hill*, the debtor was waiting to receive his student loan and the University agreed to hold the debtor's registration open for thirty days. *Id.* When the debtor still did not receive the loan, the University arranged for the debtor to be able to register and provided him with

$2,500 of credit, essentially, the cost of tuition for one semester. *Id.* The debtor did not sign any promissory note or similar document guaranteeing repayment. *Id.* Still, the court determined that the debtor was well aware of the terms of the loan, that the University was extending him credit in an amount certain, specifically; the cost of tuition, for which it expected repayment as soon as the debtor received his student loan. *Id.* at 647. On these facts, the court found that the extension of credit was a loan under § 523(a)(8). *Id.*

In *Merchant*, the debtor received a loan from Michigan National Bank for educational expenses. *Merchant*, 958 F.2d at 739. She also obtained assistance for educational expenses that were evidenced by promissory notes payable to Andrews University. *Id.* When the debtor defaulted on the Bank loan, the University paid the Bank and took assignment of the note. *Id.* The *Merchant* court held that the University was a nonprofit institution, that a student loan program existed between the University and the Bank and that the debtor's obligation was funded in part by the University. With these findings, the court found that the loan from the Bank was nondischargeable under § 523(a)(8). *Id.* at 740.

In addition, the *Merchant* court held that the promissory notes payable to the University were extensions of credit that amounted to nondischargeable loans. *Id.* at 740–41. The court noted that it must construe the term "loan" in accordance with its established meaning, since the Code does not expressly define it. *Id.* The court provided the following definition:

[A] contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form.

*Id.* at 741. (citing *In re Grand Union, Co.,* 219 F. 353 (2d Cir.1914); *United States Dep't of Health and Human Services v. Smith*, 807 F.2d 122, 124 (8th Cir.1986); *United Virgi-*

*nia Factors Corp. v. Aetna Casualty & Surety Co.,* 624 F.2d 814, 816 (4th Cir.1980); *Calcasieu-Marine Natl. Bank v. American Employers' Insurance Co.,* 533 F.2d 290, 296-97 (5th Cir.1976), *cert. denied, sub nom. Louisiana Bank & Trust Co. v. Employers Liability Assurance Corp.,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976)).

Furthermore, the *Merchant* court found that a loan included an extension of credit if: "1) the student was aware of the credit extension and acknowledges the money owed; 2) the amount owed was liquidated; and 3) the extended credit was defined as a 'sum of money due to a person.'" *Id.* Based on the broad definition of a loan, the court concluded that the promissory notes payable to the University were loans and nondischargeable pursuant to 11 U.S.C. § 523(a)(8). *Id.* The court reasoned that the debtor "signed forms evidencing the amount of her indebtedness before she registered for classes." *Id.* In addition, the debtor "received her education from the University by agreeing to pay these sums of money owed for educational expenses after graduation." *Id.*

Also relying on the definition of a "loan" from *In re Grand Union,* the court in *In re Ellenburg,* 89 B.R. 258, 262 (Bankr.N.D.Ga. 1988) found that claims for tuition could not be characterized as "educational loans." The *Ellenburg* court noted that "the debtor denied ever borrowing money" and "denied ever signing any document agreeing to repay an amount or to pay any interest." *Ellenburg,* 89 B.R. at 262. Thus, the court reasoned that "there is no evidence of any agreement whereby [the Universities] advanced money to the debtor or where the debtor agreed to pay tuition upon any terms." *Id.*

■ In the instant case, neither the Debtors nor their son made any arrangements to borrow money from a student loan program or Syracuse University itself. Like *Ellenburg,* there was no borrowing or transfer of money nor a promise to repay forwarded funds. Syracuse only intended on providing educational services to Neil Peller, expecting to be paid for these services.

Neil Peller did attend Syracuse and he received their educational services, but without fulling paying for them. Although Syracuse permitted Neil Peller to attend the University despite the fact he had not paid the tuition, Syracuse did not arrange to extend credit to him. Syracuse's choice to allow Peller to complete the semester without payment cannot amount to a loan or extension of credit. Instead, the University provided services for which it was not fully compensated, similar to other non-priority unsecured creditors listed in the Debtor's schedules. The tuition debt cannot be nondischargeable, under § 523(a)(8), because Syracuse did not follow through on obtaining payment prior to completion of the semester.

In addition, the letter of intent, which both the Debtor and his son signed, does not amount to a promissory note or extension of credit. This form requires an advance payment in order to hold the student's housing assignment and it informs the student that he/she is responsible for making arrangements to pay the University's fees. By signing the form the student acknowledges his/her awareness of the obligation to pay tuition. The University does not forward any funds to the student as a result of this form, nor does the University bind the student to *repay* any obligations.

Furthermore, the circumstances of the instant case are distinguishable from both the *Hill* and *Merchant* cases. In *Hill,* the debtor was well aware of the fact that the University had forwarded the debtor funds in order to enable him to register for classes. *Hill,* 44 B.R. at 646. The University expected repayment once the debtor received his requested loan funds. *Id.* at 647. *Merchant* involved both the assignment of a loan to the University and promissory notes to repay the University for educational expenses. *Merchant,* 958 F.2d at 739 and 740-41. Thus, the debtor was well aware of the transfer of funds and the duty to repay these funds.

Permitting the discharge of a debt for tuition does not contravene the purposes of § 523(a)(8). The policy behind § 523(a)(8) is to protect financial institutions and universities from students not repaying money that they borrowed. In the instant case, the University did not supply Neil Peller with funds

for his education. What the University did do was allow Neil Peller to attend classes and receive final grades in those classes, thus resulting in an exchange of educational services for money.

Syracuse contends that this Court should follow the reasoning applied in *Najafi v. Cabrini College (In re Najafi)*, 154 B.R. 185 (Bankr.E.D.Pa.1993). The *Najafi* court also addressed the issue of whether tuition constituted a nondischargeable obligation under § 523(a)(8). In *Najafi*, Cabrini College sought the determination of nondischargeability of a tuition debt for the full semester, notwithstanding that the debtor testified that he only attended for the first two weeks of the semester. *Id.* at 188. The court noted the debtor's testimony that:

> although Cabrini's policy was that students could not register for, or begin attending, classes without paying their full tuition in advance, Cabrini permitted the [d]ebtor to register and to begin classes without making any advance payment. Furthermore, there were no communications between the Debtor and Cabrini officials as to what arrangement for payment of tuition would be expected. *Id.*

The *Najafi* court concluded that the college had advanced credit to the debtor and this advance of credit was an "educational loan" to the extent the debtor attended the college that semester. *Id.* at 189. The court agreed that "it is difficult to characterize the instant [debt] as 'an obligation to repay funds,'" since the debtor did not receive funds from either the college or any lending institution. *Id.* at 190. Instead, the court reasoned that the debtor received an "educational benefit," which resulted in a nondischargeable debt under § 523(a)(8). *Id.* Thus, in interpreting the phrase "educational benefit overpayment or loan made," the court indicated that "the terms 'benefit,' 'overpayment,' and loan should be construed as a series of nouns, all modified by the adjective 'educational.'" *Id.* Furthermore, the court noted that "there is little logical reason for linking 'benefit' with 'overpayment.'" *Id.* Accordingly, the court found the debtor to be a recipient of an 'educational benefit' and determined that the amount owed for the two

weeks of attendance at the college was nondischargeable under § 523(a)(8). *Id.*

This Court must disagree with the reasoning in the *Najafi* case to the extent that *Najafi* considers attendance at an educational institution an "educational benefit," which in turn is nondischargeable. Interpreting "educational benefit overpayment" to mean "educational benefit" is not a plain reading of the statute. Under a plain reading of the statute this phrase must be read as a whole so that § 523(a)(8) includes either an educational benefit overpayment or a loan. *See Seton Hall University v. Van Ess (In re Van Ess)*, Case no. 93–2246, p. 11 (Bankr.D.N.J. May 19, 1994) (slip opinion of Bankruptcy Judge Novalyn L. Winfield) (finding the reasoning in *Najafi* strained and concluding that tuition is dischargeable under § 523(a)(8)).

In addition, the statute also requires that the educational benefit overpayment or loan be "made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution." 11 U.S.C. § 523(a)(8); *see also In re Van Ess*, slip op. at 11. Even if Neil Peller received an "educational benefit," neither Syracuse nor any governmental unit provided funds to the Debtors' son in order to obtain the educational benefit.

Moreover, reading the statute to include university services such as tuition, room and board would extend the meaning of a loan or extension of credit beyond that contemplated by Congress. Congress intended to preclude the abuse of the bankruptcy process as a means for students to discharge loans immediately or soon after graduation. The statute does not provide for the nondischargeability of any type of higher institution's services, but is limited to the extension of credit or a loan.

This Court concludes, as a matter of law, that § 523(a)(8) does not include a claim for tuition, room, board or other University services. To extend § 523(a)(8) to include services from a university or other higher education institution, where no loan or extension of credit exists, would contravene both the plain meaning of the statute as well as the legislative intent.

The Court will grant the Debtors' request set forth in their Complaint for the determination that the subject debt owed to Syracuse University is dischargeable. Accordingly, Syracuse must cease all efforts to collect this debt from the Debtors, Michael and Judith Peller. In addition, the Court finds that it need not reach the issue of whether a parent, as co-signer to a loan, is responsible for a nondischargeable debt under § 523(a)(8), since in the instant case, the debt is dischargeable.

An order shall be submitted in accordance with this opinion.